**Julia KAMP and Kenneth Kamp, Plaintiff,**

v.

**FMC CORPORATION, a Delaware corporation, Unigreen SPA, a foreign corporation, and Comet SPA, a foreign corporation, Defendant.**

**No. 99–CV–70028–DT.**

United States District Court, E.D. Michigan, Southern Division.

Nov. 5, 2002.

Ronald F. DeNardis, Detroit, MI, for plaintiff.

Thomas R. Bowen, Troy, MI, Hugh Gottschalk, Denver, CO, Michael W. Cianciolo, Detroit, MI, Jeffrey W. Gunn, Chicago, IL, for defendant.

*OPINION/ORDER REVERSING MAGISTRATE JUDGE'S DECISION TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT WITNESS J. EDSON McCANSE*

BORMAN, District Judge.

**I. BACKGROUND**

Admission of expert testimony in Federal trials is governed by Federal Rule of

Evidence 702, and the Supreme Court decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (hereinafter *Daubert*).

On June 26, 2002, Magistrate Judge Virginia Morgan ruled that "pursuant to *Daubert* and Fed.R.Evid. 702, it is the conclusion of the magistrate judge that McCanse's testimony that the sprayer is defective and unreasonably dangerous is not the product of reliable principles and methods, and therefore would not be admissible."

On July 15, 2002, Plaintiffs filed objections to Magistrate Judge Morgan's opinion. On July 31, 2002, Defendants Unigreen and Comet filed a response to Plaintiffs' objections. On August 2, 2002, Defendant FMC filed a response to Plaintiffs' Objections.

This Court concludes, pursuant to Federal Rule of Civil Procedure 72(a), that the Magistrate Judge's opinion must be set aside because it is clearly erroneous and contrary to legal precedent.

## II. DISCUSSION OF THE RULES OF EVIDENCE AND LEGAL PRECEDENT

### A. Federal Rule of Evidence 702

Federal Rule of Evidence (F.R.E.) 702, titled "Testimony by Experts", states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the wit-

ness has applied the principles and methods reliably to the facts of the case.

The Advisory Committee Notes to the year 2000 Amendments to Rule 702 note that admissibility of expert testimony is governed by the principles of Rule 104(a), and that under Rule 104, "the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." Federal Civil Rules, West Pub.2002 Revised Edition, P.414. The Notes also observe: "A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule . . . the trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system." *Id.* (citation omitted).

### B. Supreme Court Precedent

The Supreme Court noted in *Daubert,* that the Court's duty is to make "a preliminary assessment of whether the [proposed expert's] reasoning or methodology properly can be applied to the facts in issue." *Daubert* at 592–93, 113 S.Ct. 2786. The standard of evidence for determining the admissibility is "preponderance of proof." *Id.* at 593, n. 10, 113 S.Ct. 2786.

In *Daubert,* the Supreme Court discussed some of the many factors that will bear on the court's inquiry.

First, the Supreme Court noted:

> "a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested. Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry . . ."

*Id.* at 593, 113 S.Ct. 2786 (citation omitted).

The Supreme Court further noted:

> Another pertinent consideration is whether the theory or technique has been subjected to peer review and publication. Publication (which is but one element of peer review) is not a *sine qua non* of admissibility; it does not necessarily correlate with reliability.
>
> . . . .

*Id.* at 593, 113 S.Ct. 2786.

The Supreme Court further notes:

> Additionally, in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error ... and the existence and maintenance of standards controlling the technique's operation.

*Id.* at 594, 113 S.Ct. 2786 (citations omitted).

The Supreme Court concludes, as to some relevant factors it lists:

> Finally, "general acceptance" can yet have a bearing on the inquiry. A "reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community."

*Id.* at 594, 113 S.Ct. 2786.

The Supreme Court emphasized that the inquiry envisioned by Rule 702 is a flexible one:

> Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.

*Id.* at 594–95, 113 S.Ct. 2786.

The Supreme Court indicated a preference for admission of expert testimony under Rule 702:[1]

> [R]espondent seems to us to be overly pessimistic about the capabilities of the jury and of the adversary system generally. Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. Additionally, in the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment, Fed. Rule Civ. Proc. 50(a), and likewise to grant summary judgment. Fed. Rule Civ. Proc. 56. These conventional devices, rather than wholesale exclusion under an uncompromising "general acceptance" test, are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702.

*Id.* at 596, 113 S.Ct. 2786 (citations omitted).

The Supreme Court concluded:

> To summarize: "General acceptance is not a necessary precondition to the admissibility of scientific evidence under the Federal Rules of Evidence, but the Rule of Evidence—especially Rule 702—do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent

---

**1.** The Court notes the contrast with Rule 802 which states: "hearsay is not admissible ex-

cept ..."

evidence based on scientifically valid principles will satisfy those demands."

*Id.* at 597, 113 S.Ct. 2786.[2]

### C. Sixth Circuit Precedent

In *Jahn v. Equine Services,* 233 F.3d 382 (6th Cir.2000), the United States Court of Appeals for the Sixth Circuit (hereinafter Sixth Circuit), reversed a district judge's decision holding inadmissible proposed expert testimony, and remanded for a hearing. The Sixth Circuit noted that the Supreme Court, in *Daubert* "explained that Rule 702 displays a 'liberal thrust' with the 'general approach of relaxing the traditional barriers to " 'opinion' " testimony' ". *Jahn* at 388 (quoting *Daubert* at 588, 113 S.Ct. 2786). Additionally the Sixth Circuit noted that:

> Experts are permitted a wide latitude in their opinions, including those not based on firsthand knowledge, so long as "the expert's opinion [has] a reliable basis in the knowledge and experience of the discipline."

*Id* at 388 (citations omitted).

> In *Jahn,* the Sixth Circuit pointed out:
> *Daubert* and Rule 702 require only that the expert testimony be derived from references based on a scientific method and that those references be derived from the facts of the case at hand, not that they *know* answers to all the questions a case presents—even to the most fundamental questions.

*Id.* at 390 (citation omitted) (emphasis in original).

The Sixth Circuit noted that "comparing two pieces of evidence and determining which is more credible should be left for the finder of fact and should not be considered when ruling on 702 admissibility." *Id.* at 391.

The Sixth Circuit further noted:

> The opinions of Dr. Mundy and Dr. Robbins may very well be "shaky," but they are clearly not, as the district court apparently believed, "guesses" or "assumptions."

*Id.* at 393. Finally, it is noteworthy that the Sixth Circuit stated:

> We note, however, that a lack of supporting studies is not, in itself, fatal to the admissibility of expert testimony. *See McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1044 (2d Cir.1995) ("Disputes as to the strength of [an expert's] credentials . . . or look of textual authority for his opinion go to the weight, not the admissibility, of his testimony.").

*Id.* at 393, n. 8. The Sixth Circuit cited *Jahn,* in noting *Daubert's* description of Rule 702's liberal thrust in relaxing the traditional barriers to opinion testimony, in *Busch v. Dyno Nobel, Inc.,* No. 00–1808, 2002 WL 1608340 (6th Cir.July 18, 2002) (unpublished opinion).

The recent Sixth Circuit decision, *Clark v. Chrysler Corp.,* 310 F.3d 461 (6th Cir. 2002); # 97–6380, Oct. 24, 2002, which dealt with facts similar to the instant case, approved of the introduction of similar expert testimony. Clark involved a claim of defective design against Chrysler Corp. related to a door latch on a 1992 Dodge Ram pickup truck. Plaintiff utilized two expert witnesses one as to the latch, and the second as to the "B-pillar" on the truck.

In Clark, although the latch expert had applied scientific principles in previous tests of door latches, he didn't test the door latch involved in that case. The district judge permitted the expert's testimo-

---

**2.** In *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court applied *Daubert* to the testimony of engineers and other experts who are not scientists.

ny: "Even though he didn't do it [test] in this particular case, he can speak to these latches because he has previously tested similar latches. And the differences between those latches can be examined on cross-examination." *Clark* at 467 (quoting the District Court opinion).

Further, as in the instant case, the *Clark* expert did, as noted in the district court decision, physically examine the physical evidence: "[His opinion] is based upon his own physical examination of the latches here at issue and upon his conducting of his own testing." *Clark* at 467. The Sixth Circuit noted that the lower court found "that *Daubert* does not require an expert to come in and actually perform tests in any given situation", and that the district court "concluded that his testimony should not be precluded merely because Mr. [Billy] Peterson had not performed any testing in the case." The district court found Peterson's opinions to be sufficiently reliable because they were based on his training as a mechanical engineer and his experience as a safety standards engineer with the National Highway Traffic Safety Administration. He was therefore permitted to render an opinion at trial on how the door came open and that the latch was defective. *Id.* at 467.

The second expert in *Clark*, Andrew Gilberg, had previously done extensive testing of door latches, and had twice examined the latch in the Clark case. He also had extensive technical knowledge.

The Court of Appeals found no error in the trial court's finding that "the fact that Mr. Peterson only conducted a physical examination of the B-pillar and did not do any testing himself does not render his testimony unreliable. *Clay*, 215 F.3d at 668." Peterson had an extensive background in automobile safety testing, and he had examined Clark's truck, the accident scene, the police report, the photographs and the deposition in the case.

Similarly, in the instant case, Mr. McCanse has an extensive background as an agricultural engineer. Further, Mr. McCanse examined the hose and clip. In *Clark*, the latch failed, in the instant case, the clip failed. In both cases, the experts concluded that the failure was based on a defective design, and further that there were safer designs in the industry at that time.

Additional Sixth Circuit precedent in support of the instant decision, is *Clay v. Ford Motor*, 215 F.3d 663 (6th Cir.2000), cited with approval in *Clark*. In *Clay*, the district court permitted the introduction of the testimony of Plaintiff's expert witness Dr. Melvin Richardson on the issue of a Ford Bronco II design defect. Richardson's investigation consisted of reviewing the police accident report, some depositions and statements, and photographs, and visiting the accident site the day before he testified. Richardson did not even inspect the Bronco II, and did not test his theories that the Bronco II oversteers. In affirming the District Court's decision to admit Richardson's testimony, the Court of Appeals noted that Ford would be able to test his theories and his accident reconstruction testimony on cross-examination.

> As with Richardson's accident reconstruction testimony, Ford was able to challenge the testimony regarding the alleged defects in the Bronco II on cross-examination. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786, 125 L.Ed.2d 469.

*Clay* at 669–70.

## III. APPLICATION OF PRECEDENT TO THE INSTANT CASE

In the instant case, the initial issue is whether the Magistrate Judge's determi-

nation to exclude the testimony of Plaintiff's expert J. Edson McCanse, because he did not conduct a pressurized test of the U-clip on the hose, was an abuse of discretion.

This case involves an allegation of injury to plaintiff on August 5, 1998, while working with a hydraulic sprayer at her cherry orchard in Northern Michigan. Specifically, while spraying her crop, the hose connection uncoupled, released a chemical pesticide (Paraquat) contained in the sprayer, causing the pesticide to be sprayed on plaintiff. Further injuries occurred from this uncoupling when she jumped off the tractor—while attempting to reach the still-moving tractor to turn off the motor, the tractor ran over Plaintiff's foot causing her to fall underneath the wheel of the moving tractor.

The parties agree, and the Magistrate Judge's opinion acknowledges, that Mr. McCanse's credentials are not at issue—his opinion is.

*The Magistrate Judge's Opinion*

Mr. McCanse submitted an opinion letter outlining the basis for his opinion, and eight separate preliminary reasons to support his opinion that the sprayer was defective and unreasonably dangerous. (Exh. R). As noted in the Magistrate Judge's opinion of June 27, 2002:

> The preliminary reasons and conclusions were culled from his study of the pleadings, photographs of the sprayer pump, photographs of the accident scene, documents subpoenaed from Jim Ben sprayers and deposition testimony of 13 listed witnesses. In addition, plaintiff submitted a supplemental brief which outlines additional steps taken by Mr. McCanse in formulating his opinion. In the affidavit of Mr. McCanse, he states that he inspected and tested the sprayer involved in this case. He visited the accident site and inspected the sprayer. He

also used a dial indicator to measure the fitting in its unaltered state. Upon examination, Mr. McCanse cleaned and reassembled the sprayer and took photographs of the sprayer. He took various measurements, but did not use a force scale and so did not measure the number of pounds of force required to insert the retaining clip into the female diaphragm or to remove it. He conducted a series of measurements, considered the design, and compared the sprayer with various drawings. (Exhibit A to Plaintiff's Supplemental Brief).[3]

---

3 Defendants object to this affidavit, stating that the purpose of a supplemental filing was only to permit discussion of case law. However, the court has considered this affidavit since the same would likely be raised in an appeal and it would be in the interest of judicial economy for the magistrate judge to consider it at this stage of the proceeding. Mag. Judge Opinion, June 27, 2002 Pp. 6–7.

The Magistrate Judge then discussed 6 of the 8 opinions presented by McCanse which the Magistrate Judge believed Plaintiff sought to admit: # 's 1, 2, 3, 4, 5, and 7. These opinions speak directly to the sprayer hose fitting at issue and detail his examination and his conclusions.

Opinion 1 evaluated the male/female pressure fitting which came apart. The connection was fastened with a U-clip which he opined came apart because of gravity, pressure, looseness of fitting, and the motion of the tractor. The Magistrate Judge recognized that McCanse opined that "the design of the U-clip was defective because it was open-ended and inserted from the bottom of the connection." The opinion further noted the expert's theory:

> As a result of the U-clip's design, a combination of gravity, looseness of the fitting, and the vibration and pressure

created during the sprayer's operation caused the clip to vibrate out of position. *Id.* at 7.

Opinion 2 dealt with the discharge fitting at the pump being angled upward and pointing at the driver's position, which, if it came loose, would spray directly onto the operator. McCanse opines that "[t]he fitting could have been just as easily positioned to direct the spray away from the operator." *Id.* at 7. The Magistrate Judge noted that McCanse "testified that at the very minimum he agreed with the position of defendant FMC's Engineering Dept. that the retaining clip should be replaced with nuts and bolts." *Id.* at 8.

Opinion 3 opined that safety protocol required the manufacturer to design out the hazard which could have been easily done by (1) warning the user of the hazard that the clip could come loose, or (2) locate or shield the pressurized hose so that in the event of rupture, a stream of fluid is not discharged directly onto the operator. *Id.* at 8.

Opinion 4 asserted that Defendant FMC was aware of the problem.

Opinion 5 asserted that there were no safety signs appropriately displayed on the sprayer as required by the American Society of Agricultural Engineering (ASAE), of which McCanse has been a member since 1951.

Opinion 6 asserted that the operator's manual did not come close to conforming to ASAE standards.

Opinion 7 stated that "[t]here were several designs of safe clip couplings in use for years which never should have blown off, such as cam and groove coupling. This coupling would have eliminated the hazard and is available at nominal costs." *Id.* at 9.

Opinion 8 dealt with the warranty or liability of defendant FMC, given their disclaimer on the back of their invoice. The Magistrate Judge's opinion noted that Plaintiffs' brief does not argue in support of the admissibility of this opinion. *Id.* at 10.

The Magistrate Judge's opinion recognized that McCanse is a well qualified expert:

In this case, Mr. McCanse appears to be well qualified as an expert in the field of agricultural engineering and safety . . M.J. Op. at 11.

The basis for the Magistrate Judge's conclusion rejecting McCanse's testimony at trial, was her determination that his methodology was faulty:

Here, Mr McCanse did not undertake any testing. He did measure the sprayer, but did not perform measurements of stress, vibration, or force required to disconnect the relevant parts. There was no testable hypothesis which could be tested or replicated.

*Id.* at 10. The Magistrate Judge's opinion further noted:

McCanse did not perform any tests, analyze any measurements, or otherwise assess the fatigue of the metal, force required for disconnection, vibrations sustained, or otherwise have any quantifiable results to support his conclusions. He must have some "analytically sound" basis for his opinions; otherwise, they are merely "speculation" by the expert.

*Id.* at 12.

The Magistrate Judge acknowledged that: "Mr. McCanse inspected the sprayer, removed the clip, inspected it, and fully reinstated it." *Id.* at 12. However, the Magistrate Judge held that under *Daubert,* because McCanse did not utilize a pressure test on the hose connection, "there are no test results to review or measurements to assess in support of his

conclusion" that the sprayer is defective because the clip can fall out due to vibration and gravity when it is properly installed.

The Magistrate Judge's opinion concludes:

> The most important aspect of Mr. McCanse's opinion is that the U-clip would vibrate out because of design. However, he cannot specify the time this would take and the conditions required. No testing or other reliable methodology supports the opinion, and therefore, this opinion would not be helpful to the jury.

## CONCLUSION

For the reasons discussed herein and pursuant to *Daubert* and Fed.R.Evid. 702, it is the conclusion of the Magistrate Judge that McCanse's testimony that the sprayer is defective and unreasonably dangerous is not the product of reliable principles and methods, and therefore, would be inadmissible.

*Id.* at 16.

### *The Affidavit of J. Edson McCanse*

The March 3, 2002, affidavit of Plaintiff's expert, J. Edson McCanse (Pl's Objections to Opinion on Expert Testimony, Exh.A), which was considered by the Magistrate Judge in rendering her opinion (the affidavit is attached to this opinion), states in pertinent part:

1. That he inspected the defective sprayer on September 17, 1998

2. That he utilized a dial indicator, "which measures to an accuracy of 1/1000ths of an inch."

3. That he observed the actual accident site and the sprayer in its unaltered condition

4. That he examined the "male/female fitting (m/f) position" of the sprayer, cleaned it to remove corrosion that had built up since the accident, and then disconnected the M/F fitting and inserted the retaining clip into the female diaphragm (FD) and measured the ends of the clip that extended post the female diaphragm. He noted that when the retaining clip was not inserted into the FD, the ends of the clip were slightly sprung open.

5. He measured the distance of the outside of the retaining clip and the amount of the retaining clip had to be compressed to be parallel, so that the clip could be inserted into the FD.

6. Based on those measurements, he concluded that it did not take a significant amount of force to push the retaining clip into the FD.

7. That he "considered using a force scale, which measures the number of pounds of force applied to an object, to measure the force it takes to insert the retaining clip into the female diaphragm but Affiant felt that such a measurement was irrelevant and of no use do [sic] to the fact that it was already known that the retaining clip had fallen out during Plaintiff's use of the machine." This was later confirmed when it became known that two incidents, which occurred in 1989 and 1991 were reported to FMC Corporation and that FMC Corporation determined in 1989 that the retaining clip, in question, had a tendency to vibrate out over a period of time during operation of "the sprayer."

8. "15. That at this point, Affiant, based upon his 40 years experience as agricultural engineer, his initial observations, measurements and how the male/female fitting connected with the retaining clip concluded

that the design of the m/f fitting with the retained clip being inserted from the bottom was hazardous and that the retention of the retaining clip in the female fitting was not reliable and would not consistently hold the clip in place."

9. "16. Therefore a force scale would not prove anything because the movement of the pump and tractor, during normal operation ... would measure the minimal amount of force that was required to insert and hold the retaining [sic] into [sic] female diaphragm. That the three pistons contained within the pump cretes [sic] much more force then [sic] what is generated to insert and hold the clip. If this had been a 'vain' roller type pump, further consideration would have been given to measuring the force that is applied to insert the retaining clip."

Later in the affidavit, after further explanation, Mr. McCanse concluded that "a threaded fitting would prevent the aforementioned design/manufacturing defect." ¶ 22.

Still later in the affidavit Mr. McCanse provided an additional reason for not turning on the sprayer:

"48. That at the time of Affiant's inspection a determination was made not to turn on 'the sprayer' because the retaining clip already failed a second time, after Plaintiff's accident, when Mr. Kenneth Kamp attempted to empty the tank of the sprayer."

The affidavit, later, sets forth an additional reason for not measuring the force in this case:

"¶ 51. Further, this "force" measuring does not duplicate the scenario that was taking place at the time of the Plaintiff's accident, namely the condition of the retaining clip and male/female fitting, the position of the pin, the pressure surges created by a running pump, a vibrating and moving hose and a running tractor.

The affidavit thereafter proceeds to offer the "bolt kit" proposed by Defendant FMC as an adequate alternative design, or another alternative—a threaded connection converting the MF fitting, noting that threaded fittings are now produced and readily available.

Further alternatives included a "cam locking system, and/or a shield over the area of the outflow of the sprayer."

In the instant case, although Mr. McCanse did not perform the specific "force scale" test noted by the Magistrate Judge in her opinion, that does not impel the conclusion that he is not a proper expert witness in this case. As the McCanse affidavit notes, he did examine the specific sprayer at issue, did perform multiple tests and examinations. Further, the McCanse affidavit sets forth why he did not perform a force scale test in the instant situation. This satisfies the requirement that McCanse's opinion be based on a scientific method tied to the facts of the case at hand.

In *Jahn, supra* at 388, the Sixth Circuit pointed out that experts are permitted a wide latitude in their opinions, including those not based on firsthand knowledge. In the instant case McCanse is clearly an expert in the field at issue, has employed a scientific method, and has applied it to the case at hand utilizing a reliable basis in the knowledge and experience of the discipline.

Further, as the Sixth Circuit pointed out in *Clark*, "*Daubert* doesn't require an expert to come in and actually perform tests in any given situation."

Finally, as the Supreme Court emphasized in *Daubert*, and the Sixth Circuit has

noted time and again, Defendant's "vigorous cross-examination and presentation of contrary evidence … are the traditional and appropriate means of attacking shaky but admissible evidence." *Clay* at 669–70, quoting *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786.

The Court concludes that the expertise and testimony by Mr. McCanse, under *Daubert* and Sixth Circuit precedent belong before the jury, and that it was an abuse of discretion for the Magistrate Judge to exclude his testimony.

Accordingly, the Court reverses the Magistrate Judge's decision to exclude the testimony of Plaintiff's expert witness J. Edson McCanse.

SO ORDERED.