Michael A. NEMIR, M.D., Plaintiff,

v.

MITSUBISHI MOTORS CORPORATION, a Delaware corporation, and Chrysler Corporation, a Delaware corporation, Defendants.

No. 96–75830.

United States District Court,
E.D. Michigan,
Southern Division.

May 8, 2002.

---

2rap h.

George Hilborn, Craig E. Hilborn, Hilborn & Hilborn, Birmingham, MI, for Plaintiff Counsel.

David R. Kelly, Bowman and Brooke, LLP, Minneapolis, MN, Fred Fresard, Bowman and Brooke, LLP, Detroit, MI, for Defendants' Counsel.

## MEMORANDUM OPINION AND ORDER AS TO PLAINTIFF EXPERT THOMAS HORTON'S TESTIMONY

FEIKENS, District Judge.

## I. INTRODUCTION

Pursuant to the United States Court of Appeals for the Sixth Circuit's opinion in *Nemir v. Mitsubishi Motor Sales*, 2001 WL 223775 (6th Cir.2001) (unpublished opinion) (per curiam), and defendants' motion to exclude plaintiff expert Thomas Horton's testimony regarding his test on the actual seat belt buckle, his testimony regarding other incidents of partial latching, and his video demonstration of other buckles, I now decide the admissibility of Horton's remaining testimony. For the reasons below, I admit in part, and exclude in part, Horton's expert testimony.

## II. BACKGROUND

The factual background of this case is fully explained in my previous opinion. *Nemir v. Mitsubishi Motors Corp.*, 60 F.Supp.2d 660 (E.D.Mich.1999).

On July 30, 1999, this court excluded Horton's expert testimony because his tests of the exemplar buckles were neither relevant nor reliable under Federal Rule of Evidence 702 (28 U.S.C. § 702). Accordingly, I granted summary judgment for Mitsubishi. On appeal, the United States Court of Appeals for the Sixth Circuit upheld this court's exclusion of Horton's exemplar buckle tests but remanded for consideration other portions of Horton's testimony and submission of the case to a jury. *Nemir*, 2001 WL 223775.

Now Mitsubishi moves to exclude Horton's testimony on his test of the actual buckle, his testimony on the alleged other incidents of partial-engagement, and his video demonstrations from other litigations.

## III. ANALYSIS

### The Sixth Circuit Opinion

In *Nemir v. Mitsubishi*, 2001 WL 223775, the United States Court of Appeals for the Sixth Circuit reversed in part this court's order excluding the entire testimony of plaintiff's expert Thomas Horton because his tests on the exemplar buckle failed to meet FRE 702 and the *Daubert* standard. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). While the Sixth Circuit upheld the exclusion of Horton's test on the exemplar buckles, it held that this court "erred in its analysis by excluding Horton's *entire* testimony." *Id.* at *3 (emphasis added). Moreover, "[i]t was arbitrary to decide that analysis would focus on a single aspect of Horton's testimony." *Id.* Finally, "the district court neglected to review the admissibility of the

remainder of Horton's testimony." *Id.* at *4.

The panel then proceeded to list portions of Horton's testimony that I failed to consider because they were independent of Horton's exemplar buckle tests. These include Horton's testimony: 1) regarding the mechanics of seat belt operation; 2) the occurrence and testing of the partial latch phenomenon, federal regulations governing it, and existing alternate design; 3) numerous scratch-marks on plaintiff's buckle, indicating frequent use; 4) his test on the actual seat belt and his testimony that it took "more than a reasonable amount of poundage to pull it out of partial engagement."; 5) a seat belt's ability to partially latch utilizing any method available which creates an inherently dangerous product; and 6) Horton's belief that the design defect is causally connected to plaintiff's injuries. I now consider them in detail.[1]

*Admissibility of Expert Testimony*

Federal Rule of Evidence 702, amended in 2000, states the standard for admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The proponent of expert testimony bears the burden of establishing that such requirements have been met by a "preponderance of the evidence." *See Bourjaily v. United States,* 483 U.S. 171, 172–173, 107 S.Ct. 2775, 2776–2777, 97 L.Ed.2d 144 (1987). Nonetheless, proponents of the expert testimony need not demonstrate that the assessments of their experts are correct, only that their opinions are reliable. *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 744 (3d Cir. 1994).

In *Daubert,* the United States Supreme Court held that FRE 702 requires trial judges to perform a "gatekeeping role" when considering the admissibility of expert testimony. *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786. *Daubert* and FRE 702 "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.*

To determine reliability, *Daubert* suggests several factors that trial judges may consider: (1) whether the proposed hypothesis is testable, (2) whether the theory or technique has been subject to peer review or publication, (3) the known or potential error rate, and (4) whether the theory or technique is "generally accepted." *Id.,* at 593–94, 113 S.Ct. 2786. These suggested factors are not presented as a "definitive checklist," *(id.,* at 593, 113 S.Ct. 2786) but are offered to assist trial judges in their "flexible" inquiry as to the reliability of expert testimony *(id.,* at 594, 113 S.Ct. 2786). In addition to these *Daubert* factors, the Sixth Circuit has added a fifth factor: "whether the experts are proposing to testify about matters growing natu-

---

1. I have already excluded Horton's expert testimony regarding his tests on the exemplar buckles in my previous opinion, *Nemir v. Mitsubishi Motors Corp., et al.,* 60 F.Supp.2d 660 (E.D.Mich.1999), which was upheld by the Sixth Circuit. *Nemir v. Mitsubishi Motors*

*Sales,* 2001 WL 223775 at *3 (6th Cir.2001) ("While the trial court's investigation and issued opinion appear to exhaust this subject, it is clear that the district court erred by excluding Horton's *entire* testimony.") (emphasis added).

rally and directly out of the research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying because the former provides important objective proof that the research comports with the dictates of good science." *Smelser v. Norfolk Southern Railway Co.*, 105 F.3d 299, 303(6th Cir.1997) (citations omitted).

In *Kumho Tire Company v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court reiterated *Daubert's* central holding that trial judges must perform a gatekeeping role as to all proffered expert testimony. *Id. Kumho* held that trial courts may consider the specific *Daubert* factors in assessing the reliability of all types of expert testimony, including both "scientific" and "technical" evidence. *Id.* In considering scientific expert testimony, the inquiry focuses on the principles and methodologies relied on by the expert. The Sixth Circuit in *Smelser* explained:

> First, the court is to determine "whether the experts' testimony reflects 'scientific knowledge,' whether their findings are 'derived by the scientific method,' and whether their wok product amounts to 'good science.'" An expert opinion that is based on scientifically valid principles will satisfy FRE 702; an expert's subjective belief or unsupported speculation will not.

*Smelser*, 105 F.3d at 303

■ An expert witness may also rely on his experience as the basis for his testimony. If the witness is relying solely or primarily on experience, then he must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. *See* F.R.Evid. 702, Comment 2000 Amendments. This court's gatekeeping function requires more than simply taking the expert's word for it. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1319 (9th Cir.1995) (on remand) ("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert*, that's not enough."). The more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable. *See O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090 (7th Cir.1994) (expert testimony based on a completely subjective methodology held properly excluded).

■ Moreover, the proffered testimony must also be relevant. *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786. The court must "ensure that the proposed expert testimony is relevant to the task at hand." *Smelser*, 105 F.3d at 303 (citations omitted). In other words, the expert's scientific testimony must "fit" the facts of the case. *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786.

As a gatekeeper, this court is required to decide whether Horton's expert opinions, and the basis for those opinions, are reliable and relevant. I now turn to Horton's proffered testimony.

### A. Horton's Expert Testimony on the Mechanics of Seat belt Operation

■ Because Horton has extensive experience as an automotive safety engineer with General Motors, TRW, Inc., and Takata, and because the testimony is relevant to this case, his testimony regarding the mechanics of seat belt operation will be admitted.

### B. Horton's Expert Testimony Regarding an Existing Alternative Design

In his deposition of December 28, 1998, Horton testified that the RNS–3 seat belt was an existing alternative design that circumvented the problem of partial latch.

(Horton Dep., Dec. 28, 1998 at 198–99). Because Horton has extensive experience as an automotive safety engineer with General Motors, TRW, Inc., and Takata, and because it is relevant to plaintiff's *prima facie* case of establishing a design defect, his testimony that the RNS–3 was an existing alternative design that circumvents the issue of partial latch will be admitted.

#### C. Horton's Expert Testimony Regarding the Numerous Scratch-marks on Nemir's Buckle

Because the indication of frequent use bears on the issue of causation, and based upon his expertise, experience and training as an automotive safety engineer, Horton's testimony regarding the numerous scratch-marks on plaintiff's buckle and his testimony indicating frequent use will be admitted.

#### D. Horton's Testimony as to the Occurrence and Testing for Partial Engagement

Because of Horton's experience as an automotive safety engineer, his testimony as to the occurrence and testing methods generally used to test partial engagement will be admitted. However, for the reasons discussed below in Section I, Horton may not rely on his tests on either the actual buckle or the exemplar buckles (which were excluded in the previous opinion).

#### E. Horton's Testimony as to the Federal Regulations Governing Partial Engagement

Because of Horton's experience and training as an automotive safety engineer, he will be allowed to testify regarding the federal regulations governing seat belt partial engagement. However, as discussed in section J below, I must interpret the meaning of the regulation as a matter of law. Accordingly, while Horton may testify regarding the regulations, his testimony on the interpretation of the regulation is outside the scope of the jury's fact-finding duty and is therefore irrelevant and inadmissible.

#### F. Horton's Testimony that the Buckle's Ability to Latch Under any Method Creates an "Unreasonably Dangerous Product."

■ Pursuant to the Sixth Circuit opinion, this portion of Horton's testimony will be admitted.

#### G. Horton's Testimony as to Other Alleged Incidents of Partial Engagement

Pursuant to the Sixth Circuit panel's opinion, plaintiff deposed thirteen customers who lodged customer complaints with Mitsubishi regarding seat belt problems. Plaintiff now submits nine of the thirteen witnesses as deposition witnesses for the trial because Horton has determined that four customers did not involve Takata 52 series buckles.

Even though Horton did not personally interview these witnesses and did not conduct tests on their buckles, his experience and training as an automotive safety engineer nonetheless qualify him to testify about these customer complaints.

#### H. Horton's Testimony that the Design Defect is Causally Connected to Nemir's Injuries

■ "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786. "For scientists, a new idea or explanation is not valid unless there is the possibility that empirical testing can prove it false and until it has withstood thought-

ful efforts at falsification." Bert Black, Francisco J. Ayala & Carol Saffran-Brinks, *Science and the Law in the Wake of Daubert: A New Search for Scientific Knowledge*, 72 Texas L.Rev. 715, 753–4 (1994).

Horton hypothesizes that plaintiff's seat belt buckle was partially latched at the time of the accident. Defendants note that there is no physical evidence that his seat belt was partially latched. In response, Horton explains that "there's no physical evidence that you would have [of partial latching]." (Horton Dep., Dec. 28, 1998 at 161). If partial latching is to be demonstrated by a lack of evidence, however, there is no possibility that empirical testing can prove the hypothesis false.

Take, for example, the affidavit of Stephen R. Syson that plaintiff submits to buttress the reliability of Horton's testing methods. (Pl. Br. Opp. Def.'s Mot. to Exclude Test of Thomas Horton at Ex. 17). In his affidavit for *Ballard v. General Motors*, Syson lists evidences that point to his conclusion that partial latching occurred, and used them to eliminate other potential causes to the victim's injuries. He examined the evidence and explained, step by step, how he eliminated other possibilities and arrived at his conclusion.[2] Horton does not do any of this. He does not demonstrate how he arrived at his conclusion that partial latch caused Nemir's injuries or how he eliminated other possibilities, chief among which is the possibility that Nemir was not wearing a seat belt.

This said, however, expert testimony "need not eliminate all other possible causes" in "order to be admissible on the issue of causation." *Jahn v. Equine Services, PSC*, 233 F.3d 382, 390 (6th Cir. 2000). Accordingly, Horton, based on his

general testimony that partial latching may occur, cannot testify that partial latching was the sole cause of Nemir's injuries.

*I. Horton's Test on the Actual Buckle*

As stipulated in the final pre-trial order, Horton proposes to testify that

the load testing he has conducted confirm [sic] that the subject buckle did not comply with FMVSS 209's partial engagement standards. (*Amended Final Joint Pretrial Statement*, Ex. 7 at 3.)

FMVSS 209, § 5.2(g) governs the testing of seat belt buckles for partial engagement:

A metal-to-metal buckle shall be examined to determine whether partial engagement is possible by means of any technique representative of actual use. If partial engagement is possible, the maximum force of separation when in such partial engagement shall be determined.

■ I must interpret federal regulations as a matter of law. *See Bammerlin v. Navistar*, 30 F.3d 898, 900 (7th Cir.1994) ("The meaning of federal regulations is not a question of fact, to be resolved by the jury after a battle of experts. It is a question of law, to be resolved by the court."); *see also Specht v. Jensen*, 853 F.2d 805 (10th Cir.1988) (en banc) (same).

■ As I interpret the regulation, it outlines a two-part test in testing seat belt buckles for partial engagement. First, a buckle must be tested to determine whether partial latching is possible. The test must be representative of actual use, meaning that it must use a method which models a typical and foreseeable manner

---

**2.** This is not to say that I agree with Syson's analysis that partial latching occurs in real world situations or that I would admit his testimony if it was proffered. Suffice it now to say that, at a minimum, Horton does not demonstrate how he arrived at his conclusion and does not demonstrate how he eliminates other possibilities.

by which a person latches or unlatches his seat belt. Second, if partial engagement is possible, then it is necessary to measure the force needed to unlatch the buckle and the maximum amount of force needed to unlatch the buckle.

Horton, however, fails to meet either step of the regulation. First, despite the regulation's demand that the "maximum force of separation should be measured," Horton did not attempt to pull the buckle out of partial engagement, nor measure the maximum force.[3] In his deposition on February 18, 2002, Horton admitted that he had never pulled the actual seat belt out of partial engagement, let alone measure the amount of force it took to do so.[4] Horton Dep., Feb. 18, 2002 at 271, lns. 12–25. He also admits that his "inspection" of the actual buckles fails to meet the FMVSS 209 test for this precise reason. Horton Dep., Feb. 12, 2002 at 441–43.[5]

Moreover, plaintiff present the affidavit of Syson to testify that he has "peer-reviewed" Horton's methodology and concluded that Horton's testing methods on the TK 52 series buckle for partial engagement are "scientifically sound." (Pl. Resp. Br. to Def.'s Mot. In Limine to Exclude Horton's Testimony, at ex. 17.) However, unlike Horton, Syson's affidavit in the *Ballard v. General Motors* case shows that he measured the release force with a calibrated force gauge after he got the buckle to partially engage. *Id.* at 7. Instead of showing that Horton's methodologies are "scientifically sound," Syson's affidavit does the opposite: it highlights the fact that Horton failed to measure the maximum force required to separate the partially engaged buckle.

Second, Horton's test does not conform with the regulation requirement that the technique be of a kind "representative of

---

**3.** To be sure, Horton testifies that it took "more than a reasonable amount of force to pull it out of partial engagement." (Horton Dep., Dec. 28, 1998 at 134.) However, taken in context, this was Horton's claim of the defect and not his testimony on the amount of force it took to pull the actual buckle out of partial engagement. Nothing in the depositions shows that Horton ever pulled the buckles out of partial engagement.

**4.** MR. KELLY: And when you partially engaged it approximately two out of 20 times, how much force did it take to pull it out of engagement?

MR. HORTON: Didn't pull it out. That's—see to me, you could consider that to be a destructive test. So all I do is push it in and listen for a click because that's not harming anything. (Horton Dep., Feb. 18, 2002 at 323, lns 12–18.)

MR. KELLY: We certainly don't want to prohibit you doing what you think you need to do. All we ask is that we have notice and a description of what you're going to do so that we can have an opportunity to object if we think, for example, that it might be harmful to the evidence but we haven't received any such request.

MR. HILBORN: And I just want the record to reflect Mr. Horton asked to attempt to partially engage it and I told him not to. (Horton Dep., Feb. 18, 2002 at 271, lns. 15–25.)

**5.** MR. KELLY: In your opinion list that was given to us earlier as Exhibit 6, you made the statement "Does not meet requirement of FMVSS 29 concerning partial engagement." You've never done such a test on the subject buckle from the Nemir vehicle, is that correct?

MR. HILBORN: Objection to the form of the question. I don't think that's a true statement.

MR. HORTON: I have not done any force test on the subject buckle.

.    .    .    .    .

MR. KELLY: Mr. Horton, you cannot state based upon any testing you've done in this case of the subject vehicle that this—excuse me, the buckle in the subject vehicle, that this buckle does not meet the requirements of FMVSS 209, yes or no?

MR. HILBORN: Same objection as before.

MR. HORTON: Correct.

(Horton Dep., Feb 18, 2002 at 441–43).

actual use," which I interpret to mean "typical and foreseeable." As demonstrated in his deposition video, Horton manipulated [6] the buckle to get it into a state of partial latch. This is neither "typical" or "foreseeable." No reasonable driver purposefully manipulates the buckle at different speeds and different angles to achieve a state of partial latch as Horton does.

Nemir argues that other so-called "experts," such as U.S. Testing, employ the same methods in testing for partial engagement. However, this argument is flawed. Because U.S. Testing found that TK 52 series buckles do not partially engage under manipulated conditions, they can logically conclude, *a fortiori*, that TK 52 series buckles will not partially engage in actual use either. However, Horton cannot make the same logical inference. If a buckle can partially engage in manipulated conditions, it does not follow that it will also partially engage in actual use. Therefore, in order to show that the TK 52's violated the federal regulations, Horton must prove that the buckle partially engages using a method representative of actual use, not under manipulated conditions. *See also Dale v. General Motors Corp.*, 109 F.Supp.2d 1376 (N.D.Ga.1999) (Thomas Horton's expert testimony regarding "inertial latching" is excluded because the pendulum testing, among other things, is not representative of "real world collisions."). For these reasons, Horton's test does not conform with FMVSS 209's testing methods. I now turn to the *Daubert* standards.

### 1. Testability

First, Horton's hypothesis cannot be tested. A scientific theory is not valid unless it can be falsified through empirical testing. However, Horton does not give a description of his technique. He fidgeted with the buckle and claimed that it is partially latched. He did not videotape, photograph, or in any way record his tests except to write down notes of his results.[7] Even his notes are imprecise: his notes say that he achieved partial latch two out of approximately twenty times. In sum, his results cannot be validated and his methodologies cannot be followed with meaningful precision.

### 2. Peer Review or Publication

Second, Horton's test techniques have not been subject to peer review or publication. While the lack of peer review is not always dispositive to admissibility, peer review and scrutiny by the scientific community "increases the likelihood that substantive flaws in methodology will be detected." *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786. Plaintiff submits the affidavit of Stephen R. Syson to "peer-review" Horton's methodologies; but as discussed above, Syson's affidavit in the *Ballard v. General Motors* case highlights the deficiencies in Horton's testing method: his failure to calculate the maximum force required to separate the partially engaged buckle. Pl. Br. in Opp. to Def.'s Mot. to Exclude Test of Thomas Horton at Ex. 17. Therefore, Syson cannot reasonably "peer-review" Horton's methodologies when

---

**6.** There has been a battle over the meaning of the word "manipulate." *See Horton Dep.*, Feb. 18, 2002 at 255. The Oxford English Dictionary defines "manipulate" as "to manage by dexterous contrivance or influence." (2d Ed.1989). In this context, I use "manipulate" in counter-distinction to "actual use." In other words, I use "manipulate" to mean purposefully trying get the buckle in a state of

partial latch using atypical and unforeseeable methods.

**7.** To be sure, Horton did videotape his inspection of the Nemir buckle on Feb. 16, 2002. However, this video was only an inspection, and Horton did not conduct any tests on that video. Horton Dep., Feb. 18, 2002 at 270.

Horton's methodologies fall far short of Syson's own.

### 3. Independent Testing

Finally, plaintiff has not demonstrated that Horton's tests are "conducted independent of the litigation." *Smelser*, 105 F.3d at 303. Horton's submissions, including depositions from other cases and video demonstrations, all arise out of other seat belt litigations.[8] His tests on the exemplar buckles and the Nemir buckle were all done for the purpose of testifying at trial and provide no "objective proof that his research comports with the dictates of good science." *Smelser*, 105 F.3d at 303 (*quoting Daubert*, 43 F.3d at 1317 (on remand)).

For the foregoing reasons, Horton's test on the actual buckle is excluded.

### J. Horton's Testimony that it "Took a Reasonable Amount of Poundage to Pull it Out of Partial Engagement."

In the Sixth Circuit opinion, the panel understood Horton's testimony that it took "more than a reasonable amount of poundage to pull it out of partial latch" to mean that Horton pulled the actual seat buckle out of partial latch with more than a reasonable amount of force.[9] However, Horton testified at a subsequent deposition that he never pulled the actual buckle out of a state of partial engagement,[10] and therefore could not have made the determination of "reasonable amount of poundage." Instead, Horton testified that he believed the design defect of the TK 52 series buckle in general was that when in a state of partial engagement, it takes more than a reasonable amount of poundage to pull it out of partial engagement. And he may so testify.

### K. Horton's Video Demonstrations of the Other Latches

Horton's video demonstrations for other litigations are excluded for the same reasons that his tests on the exemplar buckles and the actual buckle are excluded: his tests are unreliable.

### Conclusion

For the foregoing reasons, Horton's testimony as to the mechanics of the seat belt operation, existing alternative design, numerous scratch-marks on Nemir's buckle, occurrence and testing of partial engagement, that it took "more than a reasonable amount of poundage to pull the actual buckle out of partial engagement", federal regulations governing partial engagement, and that the buckle's ability to partial latch under any method creates an "unreasonably dangerous product" will be ADMITTED. Horton's test on the actual buckle, his testimony that the design defect is the sole cause of the plaintiff's injuries, and other video demonstrations of other buckles are EXCLUDED.

**IT IS SO ORDERED.**

---

8. Indeed, Horton's expert testimony has been excluded in another case where he testified that "inertial latching" of the seat belt caused plaintiff's injuries because his pendulum test, *inter alia*, did not reflect "real world collisions" and did not "quantify the forces involved in the accident." *Dale v. General Motors Corp.*, 109 F.Supp.2d 1376 (N.D.Ga. 1999).

9. "While [Horton] did not measure the exact amount of force required to pull Dr. Nemir's belt out of partial engagement, he testified that the buckle took 'more than a reasonable amount of poundage to pull it out of partial engagement.'" *Nemir* at *4

10. *See* n. 4, *supra*.